[Cite as *State v. Davis*, 2019-Ohio-3381.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                          :

    Plaintiff-Appellee,                         :

                                   No. 18AP-502

v.                                                          :        (C.P.C. No. 17CR-4984)

Timothy D. Davis,                                 :           (REGULAR CALENDAR)

    Defendant-Appellant.                       :

---

D E C I S I O N

Rendered on August 22, 2019

---

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Kimberly M. Bond,* for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *Yeura R. Venters,* Public Defender, and *Ian J. Jones,* for appellant. **Argued:** *Ian J. Jones.*

---

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} What judges say to jurors matters. And when a judge tells a juror at the outset of a criminal case that the defendant does not contest that the crime alleged was in fact committed by someone with that defendant's own name, the juror can be expected to take note. Such a circumstance would narrow down any pool of potential wrongdoers, to say the least, and the concession would substantially alter the burden of proof.

{¶ 2} Here the judge, through different formulations, conveyed that unusual and unusually potent message more than once, and to more than one prospective and eventual juror. When the defense at last balked, the judge responded that the lawyer could straighten things out. The process moved forward, with no judicial correction requested or made.

{¶ 3}   The prosecution called police officer witnesses to identify defendant Timothy D. Davis as the man who had struggled with police in a night-time incident on Kelton Street and who had injured one officer before fleeing.  The defense called its own witnesses, seeking to show that Mr. Davis had not been the culprit but that the struggle had been with an unidentified man who may have been at the scene for the "soup kitchen"-type offerings provided to the homeless by Mr. Davis's mother.  The jury then convicted Mr. Davis of assault and of obstructing official business, while acquitting him of felonious assault with a repeat violent offender specification; the judge sentenced him to two and a half years in prison.

{¶ 4}   On appeal, Mr. Davis mounts five assignments of error.  The first, which determines the outcome here, recites that: "Defense counsel's performance was deficient by allowing five of the jurors who voted to convict to hear the trial judge's repeated mischaracterizations of the defense's theory of the case, an error so serious as to deprive appellant of a fair trial and to undermine confidence in the trial's result."

{¶ 5}   The judicial commentary that the defense now protests, but that went unchallenged at the time of the remarks, came during the jury selection process.  The judge, quite prudently, had decided that voir dire would be conducted in small groups so as to avoid wider possible contamination of the jury pool when the court sought to ascertain whether any potential juror had heard of another, apparently widely publicized matter involving Mr. Davis and police officers.  But the trial court's inquiries ranged beyond that other episode.

{¶ 6}   So, for example, in addressing three potential jurors one of whom (designated for voir dire as juror 7) made it onto the jury,  the judge informed the group:

> THE COURT:  * * * * The defense, as I understand it, is not necessarily contesting that somebody named Tim Davis had a fight with police, but it's a question of whether this is the Tim Davis that had that fight. The defense is going to rely on the fact that there's a lot of people named Tim Davis in town, and that it may be that this Tim Davis was the wrong guy and he's gotten arrested wrongly, and so forth * * *. [I]t's sort of a

common name, and we want to make sure that none of you
knew anything about an arrest up on Kelton Street * * *.

April 30, 2018 Voir Dire Transcript at 26-27.

{¶ 7}  Moments later, the judge in speaking to the same three potential jurors, including number 7, returned to the same notion that there was a "right" Tim Davis to be charged and perhaps a wrong one:

THE COURT: * * * * [C]an all of you decide this case fairly just
on what evidence is offered about whether or not there was a
crime committed in September of 2016 and whether or not the
police charged the right Timothy Davis?

April 30, 2018 Voir Dire Transcript at 30.

{¶ 8}  That was not all.  The judge had advised another group of two potential jurors, both of whom then served on the actual jury (voir dire jurors 4 and 5), of the same apparently risible defense concession/theory about some other Tim Davis having been the object of an attempted arrest at the home of the mother of "this Tim Davis":

THE COURT:  The question as I believe the defense is going
to frame it is there are lots of Tim Davises in this town and
they've got the wrong guy. In all seriousness, that's one reason
we're trying to be careful about picking a jury. If somebody
knows Tim Davis and it's the guy from Upper Arlington or
Grove City or Reynoldsburg but not this Tim Davis, who is
from some place else, you know, we want to make sure we get
that out.

April 30, 2018 Voir Dire Transcript at 14 (not reflecting who may have laughed).

{¶ 9}  Along with flagging other comments by the judge to a potential juror who was among those excused by defense peremptory challenge, *see* Appellant's Brief at 5 and April 30, 2018 Voir Dire Transcript at 23 (referencing a possibility that "this is the wrong Mr. Davis"), Mr. Davis in his appeal also points to a perhaps more ambiguous comment by the judge to another two eventual jurors (voir dire numbers 1 and 2) that requires adding emphasis to the transcript to convey the intonation that the defense here suggests, *see* Appellant's Brief at 3 and Voir Dire Transcript at 4 (emphasis added) ("THE COURT:  "The

case is about whether *this* Mr. Davis resisted arrest or fought with police in September 2016 on Kelton Street").

{¶ 10} Trial counsel for Mr. Davis did not object to any of the implied defense admissions or characterizations of the defendant's case or argument. Rather, and after the unchallenged judicial representations to jurors 4, 5, and 7 (and the more ambiguous observation to jurors 1 and 2), Mr. Davis's trial lawyer informed the judge—outside the presence of any jurors—that the defense was in no way conceding that anyone named Tim Davis had been involved in a fracas at his mother's house that night: "We're not saying it was a different Tim Davis on the porch. We're just disputing the identity in general." April 30, 2018 Voir Dire Transcript at 35. The judge responded: "Okay. All right. I may have misspoke. You can certainly clear that up." Defense counsel did not ask the judge to replace the few affected members of the jury pool with fresh members of the venire, or to take any other corrective action. The judge let his comments stand, and never explicitly recanted to any juror any judicial comment to the effect that the defense did not dispute that "somebody named Tim Davis had a fight with police," or that "the defense is going to frame it [that] * * * there are lots of Tim Davises in this town * * * ."

{¶ 11} The defense, however, *did* contest that "somebody named Tim Davis had a fight with police" at the house of defendant Tim Davis's mother. And a "lots of Tim Davises in this town" defense was never advanced, "[i]n all seriousness" (despite the improbability that some other Tim Davis would be at the house of "this Tim Davis['s]" mother) or otherwise. Rather, as the trial unfolded, both sides focused on whether two police officer witnesses were accurate beyond a reasonable doubt in identifying defendant Mr. Davis (and not anyone else) as the person involved in the altercation.

{¶ 12} For the state, experienced Officers Timothy Stout and Kyle McKeon each testified that they had gone to Mr. Davis's mother's house at some point between 8:30-9:00 p.m. on September 22, 2016 in effort to serve a several days' old arrest warrant on Mr. Davis. Neither knew or had met Mr. Davis, but they had a copy of a mug-shot of him on their cruiser computer screen and Officer Stout had obtained further pictures from Facebook postings. Arriving after dark, they saw from their vehicle two black males seated on the front porch. They ruled out the "younger," "skinnier" person as being Mr. Davis, but on initial observation Officer Stout was "fairly certain" the other individual was Mr. Davis.

May 1, 2018 Trial Transcript Vol. II at 35 (Officer Stout testimony); *see also, id.* at 73 (Officer McKeon testimony that "we were like, the guy in the chair, you know, could be him"). After Officer McKeon illuminated the scene with the car headlights (adding to the porch light and ambient light from the open door of the house), Officer Stout used Bosch binoculars to view the subject and became "certain it was Timothy Davis." *Id.* at 36, 38 (Officer Stout); *see also, id.* at 74, 75 (Officer McKeon re Officer Stout: "He's like, I think it's Tim").

{¶ 13} Leaving their car, the officers approached the porch, which Officer McKeon lit up with a mag flashlight, and Officer Stout ordered, "Tim, stand up." *Id.* at 40, 42. Officer Stout by this point was "[a]bsolutely" certain the subject of their scrutiny was Mr. Davis. *Id.* at 42 (adding, "I know it's him a hundred percent"). So was Officer McKeon, *id.* at 76 (beyond doubt, "it was Mr. Davis"), who testified that he said, "[h]ey, Tim, don't move," *id.* The person responded by opening the screen door to enter the house, saying "I'll go in and get him inside," *id.* at 42 (Officer Stout), or "I'm not Tim, but Tim is inside, I can get him," *id.* at 76-77 (Officer McKeon). Officer Stout, then about eight inches from the man's face, sought to restrain him by grabbing one of his arms; Officer McKeon grabbed the other. *Id.* at 43. The officers walked the man from the porch to the driveway, where Officer McKeon handcuffed the man's left wrist. *Id.* at 44; *see also id.* at 78, 80 (Officer McKeon attesting that face-to-face, the man "looked identical to that picture" the police had of Mr. Davis). The man resisted; the officers took him to the ground; the man "popped back up," "spinning and pushing, thrashing around." *Id.* at 45-48. The man came at Officer Kyle McKeon with a "backward fist"; the swinging handcuffs that were attached to his wrist gashed a cut over the Officer's left eye, producing significant blood and necessitating four stiches. *See id.* at 51, 54, 84-85, 95. The man then ran and escaped. *Id.* at 45-48, 86.

{¶ 14} No arrest in this case was completed that night, and it appears that Mr. Davis was not arrested until a year later. *See* March 5, 2018 Motion to Suppress at 3. Some 19 months after the events in question, each of the two officers identified Mr. Davis in court as the man with whom they had struggled; each said it was the first time he had seen Mr. Davis since that evening of September 22, 2016. May 1, 2018 Transcript Vol. II. at 42, 65 (Officer Stout, expressing "zero doubt"), 76 (Officer McKeon). Officer Stout added that although he had not noted it in his report, *id.* at 61-62, the man on the porch whom he identified as

Mr. Davis had a mole on his face consistent with the mug-shot that the officers had consulted, *see id.* at 33.

{¶ 15} The defense sought to counter the Officers' identification testimony through three defense witnesses. Asad Shabazz testified that he had taken groceries to the house to stock the soup kitchen that Mr. Davis's mother, a minister, operated there. At some point before the events in question, maybe at a time between 7:45 and 8:15 p.m., he had observed two African American males sitting on the porch, the stockier of whom "could have looked like" Mr. Davis to someone else, but was not. *Id.* at 156-66. A neighbor of Mr. Davis's mother, Robert Tribune, said that he had seen a man a "couple shades" darker than Mr. Davis, but with his height and stocky build, with braids, approaching the porch roughly 30 to 40 minutes before he looked again and saw what seems to have been part of the fight. *Id.* at 170-71. He said he did not see Mr. Davis that evening. *Id.* at 171. Paris Bolden, who on occasion finds shelter at the house and who is the father of Mr. Davis's niece, identified himself as the other, slighter man who had been on the porch when the police arrived. He said that he was with an unidentified homeless man who had asked for a meal and who, while of somewhat darker skin color than Mr. Davis, was of roughly the same height and build, with braids (as opposed to what he said, in contradiction to Officer Stout, was Mr. Davis's "fade" haircut). It was that man, Mr. Bolden said, and not Mr. Davis, whom the police had identified as Mr. Davis before the "scuffle" ensued. *Id.* at 193-202.

{¶ 16} On rebuttal, Officer Stout took issue with various aspects of Mr. Bolden's account, said that a picture he had been shown of Mr. Bolden did not match his memory of the other individual from the porch, and provided further testimony suggesting that the man he identified as Mr. Davis had not appeared homeless. May 2, 2018 Trial Transcript Vol. III at 12-28.

{¶ 17} Closing arguments on both sides focused heavily on the identification issue and the contending identifications. As the prosecutor told the jury: "Folks, this is a question of identity * * *." *Id.* at 58. The state argued that the two police officers "had a very good opportunity to view" the "right person, Tim Davis." *Id.* Defense counsel, while noting that "we don't have the burden to prove this case," *id.* at 61, countered that apart from in-court identifications roughly twenty months after the fact, "[t]he only identification that was ever made was from a police car and them walking up onto a porch to a guy they had never met

and looked at a picture," *id.* at 63. Further, defense counsel argued, unbiased witness testimony indicated that "[s]hortly before the police arrived, there was a homeless man who was not Timothy, who looked similar to Timothy but was not Timothy, sitting in the exact spot that the police alleged Timothy was sitting." *Id.* at 71. And Paris Bolden "drives it home and says, [']No, it wasn't Tim. I know Tim. It wasn't him.['] Everybody says it was a short, stocky, light-skinned male with braids." *Id.* at 74. The prosecution wrapped up with an attack on Mr. Bolden's credibility and then by underscoring the "forty years of experience" of the professional police officers and emphasizing the good opportunities they had for identification. *Id.* at 83, 85-86.

{¶ 18} Identification of the man who was involved in the struggle and who injured Officer McKeon indeed was at the heart of the case. That context informs our assessment of Mr. Davis's argument that his counsel was ineffective in not objecting to and seeking to rectify the judge's statements to a juror or jurors that Mr. Davis was "not necessarily contesting that somebody named Tim Davis had a fight with police"; that the real question was "whether this is the Tim Davis that had that fight"; and that ("[i]n all seriousness"), the "question as I believe the defense is going to frame it is there are lots of Tim Davises in this town" and the police arrested the wrong one (albeit the one whose mother occupied the house at which the events occurred).

{¶ 19} We review an ineffective assistance of counsel claim to determine whether the lawyer's performance " 'fell below an objective standard of reasonableness,' " and then whether " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). *See also, e.g., State v. Romero*, S.Ct. No. 2017-0915, 2019-Ohio-1839, ¶ 27 (noting that under first *Strickland* prong, " '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms' "); *State v. Smith*, 10th Dist. No. 17AP-573, 2018-Ohio-3875, ¶ 15 ("courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

{¶ 20} Consider this hypothetical scenario. A juror in a criminal case reports that he or she has been approached by a total stranger who has relayed either (1) that the defense

doesn't dispute that the crime at issue was committed by someone with the defendant's name, or (2) that the defense would be advocating that there are lots of people in this vicinity with the defendant's name and the police simply apprehended the wrong one. It is hard to imagine that under those circumstances, defense counsel would not ask for an inquiry and some sort of curative action, and that the court would not follow through on that request.

{¶ 21} But where the comments come from the judge himself, the impartial arbiter vested with authority over the case and presumed to be privy to facts and strategies not always shared with a jury that is duty-bound to listen to his observations, the scenario is much more concerning. As both the Supreme Court of Ohio and this court have emphasized: " 'It is well known, as a matter of judicial notice, that juries are highly sensitive to every utterance by the trial judge, * * * and that some comments may be so highly prejudicial that even a strong admonition by the judge to the jury * * * will not cure the error.' " *State v. Thomas*, 36 Ohio St.2d 68, 72 (1973), quoting *Bursten v. U.S.*, 395 F.2d 976, 983 (5th Cir.1968); *State v. Gordon*, 10th Dist. No. 89AP-279, 1995 Ohio App. Lexis 859, *18-19 (March 7, 1995) (quoting *Thomas* quoting *Bursten*); *see also, e.g., Quercia v. U.S.*, 289 U.S. 466, 470 (1933) (recognizing longstanding principle that "[t]he influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling' ") (citations omitted).

{¶ 22} Here, where the judge "misspoke" so early in the trial process, and to a limited number of potential jurors (albeit at different intervals), a potentially curative immediate admonition need not even have been attempted if the conclusion was instead to replace the affected members of the jury pool with other potential jurors. But the defense did not ask the judge to take any corrective action at all, and he took none.

{¶ 23} Because these circumstances go to the core of the defendant's right to a fair trial in which an impartial jury of his peers considers whether the state has proven his guilt beyond a reasonable doubt, we find that defense counsel's failure to seek any remedy for the judge's comments falls below the objective standard of reasonableness under prevailing professional norms. It is well understood that the "prosecution bears the burden of proving all elements of the offense charged, and must persuade the [jury] beyond a reasonable doubt of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*,

508 U.S. 275, 277-78 (1993) (citations omitted) (adding that this "beyond-a-reasonable-doubt requirement * * * applies in state as well as federal proceedings," and further observing at 279 that prosecutorial comment upon a defense failure to testify requires reversal of a conviction unless the state shows beyond a reasonable doubt that the verdict "was surely unattributable to the error"; misstating reasonable doubt standard to jury is structural error); s*ee also, e.g., Ohio Jury Instructions*, CR Section 205.01(4) (Rev. June 7, 2014) ("the defense has a right to present evidence to you, if it chooses to do so.  If the defense does not present any evidence, you may not consider that for any purpose").

{¶ 24}  Here, the trial court's comments suggested that the defense had taken on an almost insurmountable burden (to establish that the alleged conduct at the defendant's mother's house was committed by someone with the defendant's name, other than himself). In appropriately determining whether potential jurors had ever heard of a Timothy Davis, there was no need or point for the judge to attribute any theory of the case to the defense, to speculate as to any impending defense concessions, or to suggest that the defense would seek to establish something about multiple Tim Davises.  No coherent strategy would explain defense counsel's failure to seek to have the court rectify the problematic comments during voir dire. *Compare, e.g., State v. Schlosser*, 2d Dist. No. 17192, 1999 Ohio App.Lexis 2386 (May 28, 1999) (obvious counsel failure, if true, "is not a matter of trial tactics").  And contrary to the state's unelaborated argument, *see* Appellee's Brief at 10, the record here of voir dire and trial is entirely sufficient to permit direct appeal of the ineffectiveness claim: we know precisely what the judge told jurors and we know, too, that counsel requested no curative action.  With the judge having made the comments, nothing the defense counsel could have done absent objection or curative request could have fixed things.

{¶ 25}  The state argues to us that "[a]lthough the trial court may have slightly mischaracterized the defense theory of the case during the initial *voir dire*, the minor error did not merit an objection" to the extent that counsel could be found ineffective. *Id.*  Such understatement really does not describe what happened here.  We doubt that the state seeks to start every criminal case with the judge randomly telling jurors that the defense does not contest that somebody by the defendant's name committed the offense in question: all are committed to the jury system.  "The defense strategy was to dispute identity," the state continues, so "although the trial court's statements were not as succinct as appellate counsel

would have liked, the court's statements still indicated that identity would be an issue at trial." *Id.* But precisely because identity was so central to the case, the court's comments previewing a defense that never materialized about there being "a lot of people named Tim Davis in town," or advising a juror that the defense was "not necessarily contesting that somebody named Tim Davis had a fight with police," needed to be rectified. Especially given the constitutional fair trial rights implicated here, prevailing professional standards required defense counsel to address the problem and seek a remedy in a way that he did not.

{¶ 26} Moreover, our review of the entire trial transcript establishes that in the full context of this case, the failure to address the problem in voir dire was "sufficient to undermine confidence in the outcome" of the process. Identity was at issue, and was not uncontested. And the judge's comments that approached implicating someone by the defendant's name related directly to that question. The judge's comments were "of a sort most likely to remain firmly lodged in the memory" of the jurors to whom they were made, *see Quercia*, 289 U.S. at 472. Just as a judge's endorsement of a particular witness's testimony can "prejudice [the opposing party] and deprive[ ] it of a fair trial," *see, e.g., Wray v. Sandusky*, 6th Dist. No. E-17-049, 2018-Ohio-3515, ¶ 17 (echoing the Supreme Court in noting that " '[i]n a trial before a jury, the court's participation by * * * comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness,' " quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113 (1970), paragraph three of the syllabus), so too can a judge's comments purporting to offer insight into what a defendant will undertake to show (especially where the defense does not mean to pursue the promised course).

{¶ 27} Mr. Davis, and the trial process, were prejudiced by the ineffectiveness of counsel. Even though the harm could have been alleviated relatively efficiently during voir dire, *see, e.g.,* April 30, 2018 Transcript at 3 (THE COURT: "We have 30 [prospective jurors] drawn. So that if people have heard about the incident, we can make sure that they don't have views * * * that can't be set aside"), events subsequent to jury selection did not and may not have been able to cure it. *Compare, e.g., State v. Grosswiler*, 1989 Ohio App. Lexis 1079, *5 ("although the trial court correctly informed the jury as to the burden of proof when giving the jury charge at the end of trial, this does not alleviate the prejudice suffered

by appellant * * * * Additionally, a correct instruction given to the jury after the close of all the evidence should inform the jury that the court made incorrect statements concerning the burden of proof, and then correctly instruct the jury according to law").

{¶ 28} We are constrained to find that given the mistaken judicial commentary to which his lawyer did not object and that then went unremedied, Mr. Davis was deprived of the effective assistance of counsel in a way that undermined his right to a fair trial. We sustain Mr. Davis's first assignment of error; his remaining four assignments of error therefore become moot.

{¶ 29} Having sustained the first assignment of error, we reverse the judgment of the trial court and remand this matter for further proceedings on the two counts now at issue, consistent with this decision.

*Judgment reversed; case remanded.*

LUPER SCHUSTER, J., concurs.
KLATT, P.J., dissents.

KLATT, P.J., dissenting.

{¶ 30}     Although I agree with the majority decision that defense counsel was ineffective for failing to address the trial court's mischaracterization of the appellant's anticipated defense during voir dire of some of the prospective jurors, I do not agree that there is a reasonable probability that, but for defense counsel's ineffective representation, the result of the proceeding would have been different as required by *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Therefore, I respectfully dissent from the majority decision.

{¶ 31} As the majority correctly points out, the central factual issue in this case was the identity of the person who struggled with police as they tried to serve an arrest warrant. It is undisputed that this struggle occurred on or near the porch of appellant's mother's house. The state presented the testimony of the two officers who identified appellant as the person for whom they had an arrest warrant and the person with whom they struggled on the night in question. Appellant presented the testimony of one witness who testified that appellant was not the person who struggled with police. Two other defense witnesses also provided evidence suggesting that appellant was not that person. The jury obviously found

the state's witnesses more credible because they convicted appellant of assault and obstructing official business.

{¶ 32} Regardless of the fact that five jurors were told by the trial judge during voir dire that the defense theory would be that a different person named Tim Davis struggled with the police, rather than just another person who was not appellant, the jury ultimately had to decide whether or not appellant was the person who struggled with police and fled. Any possible confusion that these five jurors may have initially experienced regarding the precise nature of the defense theory would have quickly dissipated following defense counsel's opening statement. Because the jury concluded that appellant was the person who struggled with police and fled based upon the testimony of the police officers and the undisputed fact that the struggle occurred on or very near appellant's mother's porch, I cannot conclude that there is a reasonable probability that, but for defense counsel's failure to address the trial court's mischaracterization of the defense theory during voir dire, the result of the trial would have been different.

{¶ 33} Therefore, I would overrule appellant's first assignment of error, and would address appellant's remaining assignments of error. Because the majority reaches a different conclusion, I respectfully dissent.

_____